No. 2420.

CHARLEY McDANIEL v. THE STATE.

1. PRACTICE.—A MOTION IN ARREST OF JUDGMENT is available upon any
   ground which would be good upon exceptions to an indictment or infor-
   mation for any substantial defect therein; and article 528 of the Code of
   Criminal Procedure enumerates the only exceptions, under our practice,
   to the substance of an indictment. The failure of the minutes of the
   court to show the appointment of the foreman of the grand jury, or
   that the grand jury was sworn, does not come within the enumerated
   defects.

2. THEFT—EVIDENCE—CHARGE OF THE COURT.—However improbable may
   be the evidence in support of a defense, it is the duty of the trial court
   to submit the issue to the jury under proper instructions. A defense
   witness in this case testified that he was present and witnessed the de-
   fendant's purchase of the alleged stolen animal. Held, that in failing to
   submit the question of a purchase vel non to the jury, the charge of the
   court was erroneous.

APPEAL from the District Court of Leon.    Tried below before
Earle Adams, Esq., Special Judge.

The indictment in this case charged the appellant and Jim
Mathews, jointly, with the theft of one head of cattle, the prop-
erty of H. C. Coburn, in Leon county, Texas, on the fifteenth
day of July, 1886. The appellant was alone upon trial, and was
convicted, his punishment being assessed at a term of two years
in the penitentiary.

H. C. Coburn was the first witness for the State. He testified
that he knew the defendant, whom he pointed out in open court.
On or about the first day of April, 1886, the witness missed his
certain yearling from the range near his house in Leon county.
That yearling was a peculiarly fleshmarked animal, but was
neither marked nor branded. It had a crook in its tail, the re-
sult, the witness thought, of a bend in the tail bone. The witness
had milked its mother at the house where he fed her, and it was
her custom to come up at night. The yearling, which was not
yet weaned, always came up with its mother until the evening
above stated, when the mother for the first time came up alone.

The witness did not see his yearling again until the following
July, when he found it in a pasture in either Navarro or Lime-

stone county, about twenty miles from Mexia. Tom Smith, Bentley, Wilson and "Yankee" were with witness when he found his yearling in the pasture. Witness at once identified his yearling and took it home. On reaching home it at once recognized and sucked its mother. The witness lived about ten miles from the Leon county line, in Leon county. He knew that up to April 1, 1886, the yearling had never been out of Leon county. Witness never saw his said yearling in the possession of the defendant. He did not know who drove the yearling off. Witness did not consent for the defendant nor any other person to take or drive off his yearling. Defendant lived in Leon county, about two miles distant from the witness.

Americus Walker testified, for the State, that he was engaged in working on the public road on April 1, 1886. Defendant and Jim Mathews were road hands at that time, and belonged to the same gang that witness did, but neither of them worked with that gang on the said first day of April, 1886. Witness did not know what they did nor where they went on that day.

Tom Smith testified, for the State, that he knew the defendant and Jim Mathews. The witness, in April, 1886, was in the employ of Mr. Bentley, as agent in the purchase of cattle. On the second or third day of the said April, James Mathews delivered to the witness, as the agent of Bentley, a bunch of seventeen cattle. The witness received the cattle in person and examined them closely. Defendant was not present at the delivery of the seventeen head. The animals were put in Bentley's brand, sold to Walker, and were then taken by the witness to Walker's pasture, about twenty miles from Mexia. Two or three months later, the witness, Bentley, "Yankee," and perhaps others went with Coburn to the pasture to look for a yearling which Coburn claimed to have lost. On reaching the pasture Coburn at once pointed out a certain yearling which he declared to belong to him, and to be the one he lost, which was delivered to him and he took it off. That yearling was one of the animals bought by Bentley from defendant (Mathews?). That animal was very peculiarly marked. It had red sides and a white back; was bow legged, and had a very unusual crook in its tail. It was neither marked nor branded when bought by Bentley.

John Bentley testified, for the State, circumstantially as did the witness Tom Smith, except that, according to his impression, his purchase of the seventeen animals from Mathews was made

on April 7, 1886, instead of April 2 or 3, as stated by Smith. Of this, however, the witness was not positive.

— Benton ("Yankee") testified, for the State, that on Saturday, April 3, 1886, he saw the defendant and James Mathews, on the public road, about three miles from Bentley's cattle pens, driving a small bunch of cattle towards the said pens. The witness did not observe the cattle closely enough to be able to identify any of them. Witness met defendant afterward, on the same evening, and he told witness that he had left the cattle with his partner, Mathews, who was to sell them to Bentley.

Luther Rankin testified, for the State, that he lived in Leon county, Texas. On or about April 1, 1886, while at work in his corn, he saw the defendant and James Mathews driving a small bunch of cattle through an old field back of the witness's place. The witness did not take special notice of the cattle, but knew the men well

The State rested.

Joe Mathews was the first witness for the defense. He testified that he was the brother of James Mathews, and the brother-in-law of the defendant. On the first day of April, 1886, an old negro named George Washington came to the witness's house and inquired for the defendant. Defendant not being at the witness's house, the said Washington directed witness to tell defendant that he, Washington, "would have those yearlings for him on the next morning." On the following morning the witness witnessed the sale by said Washington of four yearlings to defendant and James Mathews, wrote the bills of sale himself, and saw defendant pay the said Washington sixteen dollars for same. One of the four yearlings thus sold by Washington to defendant was the yearling subsequently claimed by Coburn, and the others were the three subsequently claimed by Mrs. Walker. Those yearlings were found at the defendant's pen in Leon county. The witness knew nothing about the negro George Washington, who had but recently moved into the neighborhood. Two bills of sale were executed by Washington, both of which were written by the witness. He wrote them separately on a leaf torn from his blank book. According to his recollection a strip was torn from that leaf, about the middle, or at all events between the bills of sale as written by him. Witness was road overseer on April 1, 1886, and with the gang worked the road on that day. Neither the defendant nor James Mathews worked the road with witness's gang on that day. A few days after the

defendant's purchase of the yearlings from Washington, the witness saw Americus Walker hunting for the yearlings subsequently claimed by his mother. Witness said nothing to him about defendant's purchase from Washington, but told him where he had recently seen a bunch of Mrs. Walker's cattle. Neither of George Washington's hands were crippled.

Yow and Frank Wilcox testified, for the defense, that they saw the negro George Washington at the house of Mr. Mathews, on the morning of April 1, 1886, and heard him ask for the defendant. Early on the next morning the defendant and Joe Mathews left the house together, and Joe Mathews returned within an hour. Yow testified, also, that, on that said April 1, the defendant tried to borrow witness's horse to drive cattle on, but witness declined to lend it.

Tom Tatum testified, for the defense, that he lived near Mr. Mathews's place and knew George Washington, whom he engaged to work on his place by the month. George was on witness's place on March 31, 1886, and on April 1, until near noon. Witness did not know where he was after that hour on that day. It was too wet to work. If said Washington was crippled in any way, witness did not know it.

The defense closed.

Wat. Tinson testified, for the State, in rebuttal, that he knew the negro, George Washington, referred to by the previous witness. George Washington is dead, but was alive and testified upon the examining trial of the defendant. Washington was badly crippled at the time of the examining trial, and was barely able to walk. Witness saw the two bills of sale referred to by the witness Joe Mathews. He matched the two, to ascertain whether or not they were written on the same sheet of paper. One of the bills of sale was written on paper broader than that on which the other was written, and witness could not get the other two to match.

B. D. Dashiell testified, for the State, in rebuttal, that he examined and compared the two bills of sale referred to by the witness Joe Mathews. Those bills of sale were written on leaves that were evidently torn from an account book, as shown by the perpendicular red lines for the separation of debit and credit entries. The two would not match so as to show that they were written on the same make of paper. When they were placed together so as to extend the red lines from one to the other, the edge of one of the pieces of paper would extend beyond the

other. A written instrument was here exhibited to the witness, and he identified it as the testimony of George Washington, deceased, taken before the examining trial of the defendant. That instrument was read in evidence, for the State, as follows:

"I live at Mr. Tom Tatum's. I have been there three months. I went there on the last day of March. I moved there from Mrs. Sallie Long's. I went to Mrs. Long's from near Centreville. My wife and Hannah Overall lived with me at Mrs. Long's. I was sick, and all the work was done by them. I worked only three days while at Mrs. Long's, one day for Rube Long and one for Mrs. Long. Hannah plowed two days for Mrs. Long. My wife worked two days for Mrs. Long. The four days work done by Hannah and my wife went towards house rent. As near as I can remember, I came to Mrs. Long's after Christmas. I moved my family about February 1, 1886, and moved to Mr. Tatum's on the last day of March, and afterwards made a contract to work on his crop. I know Mr. Joe Mathews when I see him. I first saw him at Mr. Tatum's, when Mr. Tatum was sick. That was on Sunday. I have seen James Mathews several times. I never saw Charles McDaniel until yesterday, to know him. I don't know where Joe Mathews lives, and was never there in my life. Until the day before yesterday, I never knew where Charles McDaniel lives. The last day of March, when I moved to Mr. Tatum's, was Wednesday. I don't remember what I did on Thursday, but on Friday I plowed for Mr. Tatum, beginning work at sun up. I went to Mr. Tatum's house to get the plow horse. I did not see Charles McDaniel, James Mathews nor Joe Mathews at any time on Friday. I did not go to Charles McDaniel's house, nor to Joe Mathews's house, on Thursday, April 1, nor did I go anywhere on that day except to Mr. Tatum's house. I don't remember what I did at Tatum's on that Thursday. I never sold any yearlings to James Mathews nor to Charles McDaniel, nor to either of them. I never owned a cow in my life. I never had a conversation with either Mathews or McDaniel about selling yearlings to them. I never got any yearlings from Mrs. Sallie Long, nor from anybody else, for work. I never owned any cattle in my life, and never sold any cattle for myself nor for anybody else. I can neither read nor write. I have never seen the papers called bills of sale, now shown me, before. I don't know what name is signed. I never authorized anybody to sign my name to any document, and

know nothing of the yearlings described in the bills of sale, and I never saw them. My wife was at home, on Mr. Tatum's place, on Thursday and Friday, April 1 and 2, 1886. I know Cephas Burton. He lives on Mr. Tatum's place, in the house adjoining me. I don't know where Cephas was on Thursday, April 1, 1886, but he was with me all day on Friday, April 2, and until noon on Saturday, April 3. I plowed a sorrel horse, and he plowed a yoke of oxen. I was summoned to appear at this trial on Sunday, and came yesterday, Monday. I told Mr. Tatum that I was summoned to appear here, but that I knew nothing about the yearlings. He told me it was no use for me to come, and that he would attend to this matter for me. I had a conversation with Joe Mathews in Mr. Dodson's presence. Joe Mathews asked me if I signed the bill of sale, and I answered that I did not. Joe Mathews then called me a liar. I told Mr. Lindsey, when he summoned me, that I did not know anything about the case."

Cross examined: "I know what it is to be sworn in court, and I know the penalty. I know an almanac. I count from the first day of the month to the last. I simply know the date of the month because I know it. I can't read nor write. I commenced work by the month for Mr. Tatum on the first day of April. I worked for him two days before that. I can't remember what I did on Thursday, but on Friday I plowed on the other side of the branch. I worked for Mr. Tatum two days in March, but I do not remember the days. It was after dinner when I came away from Mr. Tatum's on Thursday. I did not go away from here when I left. I knew Joe Mathews when he came to Mrs. Tatum's, by hearing Mrs. Tatum say, when he came there and got off his horse: "There is Mr. Joe, Tatum." I don't know where Mr. Burton was on March 28, nor before, but I know where he was on the first and second days of April, because he plowed with me; that's the reason I know where he was. I swear positively that I was not at Joe Mathews's house on Thursday, April 1, 1886. I did not tell Joe Mathews in the presence of Mr. Yow (Dixon) to tell James Mathews and Charley McDaniel to come over, and that I had those yearlings. I swear that I did not sell four yearlings at Charles McDaniel's pen, and that I never spoke to Charles McDaniel in my life."

Cephas Burton testified, for the State, in rebuttal, that he and George Washington plowed together all day on the first and second days of April, 1886. Witness saw George Washington

at intervals throughout both of those days. Washington was then somewhat crippled, and could not walk fast.

Coburn, Walker and Rankin testified, for the State, in rebuttal, that the land occupied by them was of the same character as the land occupied by Tatum. They knew that the ground was not too wet for plowing on either the first or second days of April, 1886, because they plowed their lands on both of those days.

*Johnston & Dotson*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

White, Presiding Judge. A motion in arrest of judgment attacked the sufficiency of the indictment, because the minutes of the court do not show that a foreman for the grand jury which found the bill had ever been appointed by the court, nor do they show that the said grand jury were ever sworn.

"A motion in arrest of judgment shall be granted upon any ground which would be good upon exceptions to an indictment or information for any substantial defect therein." (Code Crim. Proc., art. 787.)

Exceptions, and the only exceptions, to the substance of an indictment in our practice are those enumerated in article 528 of the Code of Criminal Procedure, and all exceptions to form are specified in article 529. No such grounds as those here asserted are enumerated in the matters rendering an indictment defective for substance; they are matters of form only. "A mere formal objection would not be reached by a motion in arrest of judgment." (West v. The State, 6 Texas Ct. App., 485; Ferguson v. The State, Id., 504; Bailey v. The State, 11 Texas Ct. App., 140; Niland v. The State, 19 Texas Ct. App., 167; Williams v. The State, Id., 277; Weaver v. The State, Id., 547; Williams v. The State, 20 Texas Ct. App., 357.) It was not error to overrule the motion.

The only defense interposed at the trial was that the defendant had purchased the animal alleged to have been stolen, from one George Washington. Joe Mathews, a brother-in-law of defendant, testified positively to the sale by and purchase from Washington, and that he had witnessed the bill of sale. However improbable this testimony may appear in the light of the other evidence in the case, it was, nevertheless, evidence in the case, and

it presented an issue which it was the province of the jury alone to pass upon.

In his charge the learned special judge who presided did not submit the question of a purchase *vel non* to the jury. It is insufficient in this regard. (Ray v. The State, 13 Texas Ct. App., 51; Murphy v. The State, 17 Texas Ct. App., 645; Ryan v. The State, 22 Texas Ct. App., 699.) "If there is any evidence tending, though slightly, to establish a defense, the defendant is entitled to a charge directly upon that point, no matter what view the court may entertain of the weight and value of the testimony." (Scott v. The State, 10 Texas Ct. App., 112.)

Because the court failed to charge the law applicable to the defense made, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered January 28, 1888.